**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS – EASTERN DIVISION**

ChrisKen Group, LLC and
CK Property Management, LLC,

                Plaintiffs,

        v.

HAS Capital, LLC,
Stephen A. Wheeler,
Eric R. Decator LLC,
Eric R. Decator,
BMO Harris Bank National Association, and
Konstantino Apostolou,

                Defendants.

Case No. 16-CV-8251

TRIAL BY JURY DEMANDED

**FIRST AMENDED COMPLAINT AND JURY DEMAND**

      NOW COME Plaintiffs ChrisKen Group, LLC and CK Property Management, LLC, by

and through their attorneys, Stevens Law Group, and complaining of Defendants HAS Capital,

LLC, Stephen A. Wheeler, Eric R. Decator LLC, Eric R. Decator, BMO Harris Bank National

Association, and Konstantino Apostolou, state as follows:

**PARTIES TO THE TRANSACTIONS**

      1.      At all times relevant, Plaintiff ChrisKen Group, LLC ("ChrisKen") was a

domestic limited liability company duly licensed in the State of Illinois and doing business in

Cook County, Illinois with its principal place of business at 345 N. Canal St., Suite 201,

Chicago, Illinois 60606.

      2.      At all times relevant, ChrisKen was in the business of identifying, managing,

upgrading, and assisting third-parties in acquiring residential rental properties nationwide.

1

3.      At all times relevant, Plaintiff CK Property Management, LLC ("CK Property Management") was a domestic limited liability company duly licensed in the State of Illinois and doing business in Cook County, Illinois with its principal place of business at 345 North Canal Street, Suite 201, Chicago, Illinois 60606.

4.      At all times relevant, CK Property Management was a subsidiary affiliate of ChrisKen, and ChrisKen was the sole managing member of CK Property Management.

5.      At all times relevant, CK Property Management was in the business of managing rental properties that ChrisKen identified, managed, upgraded, and assisted third-parties in acquiring.

6.      At all times relevant, John "Jack" F. Kennedy ("Kennedy") was the president and chief executive officer of ChrisKen and sole managing member of ChrisKen, and the actual agent of CK Property Management.

7.      At all times relevant, Robert Mayer ("Mayer") was the vice-president and chief financial officer of ChrisKen and the actual agent of ChrisKen and CK Property Management.

8.      At all times relevant, Defendant HAS Capital, LLC ("HAS Capital") was a domestic limited liability company duly licensed in the State of Illinois and doing business in Cook County, Illinois with its places of business at 33 North LaSalle Street, Suite 3800, Chicago, Illinois 60602; 33 North LaSalle Street, Suite 1000, Chicago, Illinois 60602; 20 North Clark Street, Suite 1150, Chicago, Illinois 60602; and 30 North LaSalle Street, Suite 1402, Chicago, Illinois 60602.

9.      At all times relevant, HAS Capital held itself out as being in the business of sourcing and managing third-party equity and investing third-party equity in long-term real estate assets.

2

10.     At all times relevant, Defendant Stephen A. Wheeler ("Wheeler") was the chairman of HAS Capital and the actual and apparent agent of HAS Capital.

11.     At all times relevant, Defendant Eric R. Decator ("Decator") was an attorney licensed in the State of Illinois who acted as general counsel to HAS Capital and acted as counsel to the Sovereign Fund, as described in paragraphs 39–42, and was the agent for Toronto Peachtree LLC, as described in paragraph 20.

12.     At all times relevant, Defendant Eric R. Decator LLC ("Decator LLC") was a domestic limited liability company duly licensed in the State of Illinois and doing business in Cook County, Illinois with its principal place of business at 561 Chateaux Bourne Drive, Barrington, Illinois 60010-6312.

13.     At all times relevant, Decator was the sole managing member of Decator LLC, the actual agent of Decator LLC, the actual and apparent agent of HAS Capital, and the actual and apparent agent of the Sovereign Fund, as described in paragraphs 39–42.

14.     At all times relevant, Defendant BMO Harris Bank National Association ("BMO Harris") was an insured depository institution and national bank duly licensed to do business in the State of Illinois and doing business in Cook County, Illinois with its headquarters located at 111 West Monroe Street, Chicago, Illinois 60603.

15.     At all times relevant, Bank of Montreal ("BMO") was a foreign bank and bank holding company and financial holding company under the Bank Holding Company Act of 1956.

16.     At all times relevant, BMO Financial Corp. was a Delaware corporation, bank holding company, financial holding company, and a wholly-owned subsidiary of BMO. It was the top-tier U.S. holding company for most of BMO's United States subsidiaries, including BMO Harris, which employed Konstantino Apostolou, as described in paragraph 17.

17.     At all times relevant, Defendant Konstantino Apostolou ("Apostolou") acted as an assistant vice president and senior premier banker for BMO Harris with his offices at BMO Harris Bank N.A., 520 Green Bay Road, Winnetka, Illinois 60093, was employed by BMO Harris, and was its actual and apparent agent.

## PEOPLE/ENTITIES INVOLVED IN TRANSACTIONS

18.     At all times relevant, Adam D. Peterson ("Peterson") was employed by HAS Capital and was its actual and apparent agent.

19.     At all times relevant, HAS Capital and Wheeler held Peterson out as an agent of HAS Capital.

### The Balmoral Property

20.     At all times relevant, Toronto Peachtree LLC ("Toronto Peachtree") was a foreign limited liability company organized on July 8, 2015 under the laws of the State of Delaware with its registered agent at 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808.

21.      Toronto Peachtree was organized by Decator, Wheeler, Decator LLC, and HAS Capital for the sole purpose of executing the Balmoral purchase-sale agreement ("the Balmoral PSA") and owning the Balmoral Property, as described in paragraph 22.

22.     At all times relevant, Waterton Associates LLC ("the Balmoral Seller") was a domestic limited liability company, duly licensed in the State of Illinois located at 30 South Wacker Drive, Chicago, Illinois 60606, and was the seller of all the real property that comprised Balmoral Village Apartments, located at Peachtree City, Georgia ("the Balmoral Property").

23.     At all times relevant, Field Stern ("Stern") was the assistant to the vice president of dispositions and the actual and apparent agent of the Balmoral Seller.

4

24.     At all times relevant, Cushman & Wakefield of Georgia, Inc. ("Cushman") was a real estate brokerage firm with its offices at 55 Ivan Allen Jr. Blvd., Suite 700, Atlanta, Georgia 30308, and was employed by the Balmoral Seller to facilitate the sale of the Balmoral Property.

25.     At all times relevant, Chris Spain ("Spain") was the real estate broker for the Balmoral Seller and the actual and apparent agent of Cushman.

**The Cypress Point Property**

26.     At all times relevant, Shoptaw Group ("the Cypress Point Seller") was a business entity with its offices at Two Buckhead Plaza, 3050 Peachtree Road, NW, Suite 460, Atlanta, Georgia 30305, and was the seller of the real property that comprised Cypress Point Apartments in Alpharetta, Georgia ("the Cypress Point Property").

27.     At all times relevant, Jones Lang LaSalle ("JLL") was a real estate brokerage firm with its offices at 3344 Peachtree Road, NE, Suite 1100, Atlanta, Georgia 30326, and was employed by the Cypress Point Seller to facilitate the sale of the Cypress Point Property.

28.     At all times relevant, Derrick Bloom ("Bloom") was the real estate broker for the Cypress Point Seller, the managing director of JLL, and the actual and apparent agent of JLL.

29.     At all times relevant, Emily Richards ("Richards") was the chief financial officer and chief operating officer of the Cypress Point Seller and the actual and apparent agent of the Cypress Point Seller.

**The St. Andrews Property**

30.     At all times relevant, Invesco Global Asset Management (N.A.), Inc. ("the St. Andrews Seller") was a foreign corporation, duly licensed under the laws of the State of Delaware, with its offices at Two Peachtree Pointe, 1555 Peachtree Street, N.E., Suite 1800,

Atlanta, Georgia 30309, and was the seller of the real property that comprised St. Andrews Apartments of Johns Creek, Georgia ("the St. Andrews Property").

31.     At all times relevant, Moran & Company was a real estate brokerage firm with its offices at 3414 Peachtree Road, NE, Suite 475, Atlanta, Georgia 30326, and was employed by the St. Andrews Seller to facilitate the sale of the St. Andrews Property.

32.     At all times relevant, Sean Henry ("Henry") was the real estate broker for the St. Andrews Seller and the actual and apparent agent of Moran & Company.

## THE FRAUDULENT INDUCEMENT AND SCHEME

33.     On or about March 5, 2012, HAS Capital, through Wheeler, requested that Plaintiffs and their affiliates function as HAS Capital's and its affiliates' operating partners for multi-million dollar real estate acquisitions of 300 units or more, ranging in price from $30,000,000 to $100,000,000.

34.     At all times relevant and at HAS Capital's and Wheeler's direction, Plaintiffs:

   a.   Used their broker contacts built up over thirty years to find properties for HAS Capital to acquire;

   b.   Did all underwriting and financial analysis relating to the acquisition of those properties;

   c.   Conducted due diligence and negotiated the initial purchase for the acquisition of those properties; and

   d.   Stood ready to perform acquisition, management, and design and implementation of value-add upgrades for those properties.

35.     Prior to, on, and after November 4, 2014, Plaintiffs educated HAS Capital and Wheeler about the customs and practices of real-estate acquisitions, including the bidding

6

process and the timing of due diligence, access agreements, and purchase-sale agreements for prospective institutional owners like HAS Capital and its affiliates.

36.     Between 2012 and 2014, HAS Capital and Wheeler represented to Plaintiffs that HAS Capital was actively seeking investors to participate in real-estate acquisitions of 300 units or more, ranging in price from $30,000,000 to $100,000,000.

37.     In late March 2015, HAS Capital and Wheeler directed Plaintiffs to begin underwriting and negotiating property acquisitions for the benefit of HAS Capital and its affiliates as purchasers.

38.     Thereafter, in late March 2015, Plaintiffs began underwriting and negotiating property acquisitions for the benefit of HAS Capital and its affiliates as purchasers.

39.     In about the second quarter of 2015, HAS Capital and Wheeler represented to Plaintiffs that HAS Capital had secured a sovereign wealth fund as its investor through domestic entities and as HAS Capital's affiliate as purchaser ("the Sovereign Fund").  Wheeler further represented that the Sovereign Fund's objective was to acquire multifamily properties of approximately 300 units or more, ranging in price from $30,000,000 to $100,000,000; "[its] appetite for large properties was unlimited"; and it had "unlimited dollars to invest."

40.     Thereafter, in about the second quarter of 2015, HAS Capital and Wheeler represented to Plaintiffs that the identity of the Sovereign Fund was confidential between Plaintiffs and HAS Capital, and that it was a Middle-East, state-owned sovereign wealth fund from Qatar.

41.     Thereafter, in about the second quarter of 2015, HAS Capital and Wheeler represented to Plaintiffs that the Sovereign Fund would be HAS Capital's affiliate as purchaser in all real estate transactions, and that the Sovereign Fund would organize, capitalize, and direct

an onshore, domestic entity, such as Toronto Peachtree, to act as investor and purchaser in the real estate transactions, including the Balmoral, Cypress Point, and St. Andrews transactions.

42.     Thereafter, in about the second quarter of 2015, HAS Capital and Wheeler represented to Plaintiffs that the Sovereign Fund  was providing sufficient capital to domestic entities to be used by HAS Capital  at HAS Capital's and Wheeler's discretion to make real estate acquisitions with Plaintiffs and their affiliates as HAS Capital's operating partners.

43.     At all times relevant, Wheeler and Decator knew that any prospective seller would require, through a buyer-questionnaire and qualifying telephone conference, proof that HAS Capital and its affiliates as purchasers controlled and possessed sufficient discretionary capital to consummate any given prospective real estate transaction.

44.     On the morning of April 13, 2015, HAS Capital and Wheeler represented to Plaintiffs in an email that HAS Capital and its affiliates would have "the initial 50 million available in 3 weeks" and that Wheeler "need[s] to discuss how [Plaintiffs and HAS Capital can] get all of [their] respective documentation completed and deals started" during the week of April 13, 2015.

45.     On April 18 and 22, 2015, HAS Capital, through Wheeler and Peterson, and Plaintiffs executed an Operating Partnership and Management Agreement and compensation memorandum setting forth compensation from HAS Capital to Plaintiffs ("the Agreement"), a copy of which is attached hereto as Exhibit A.

46.     The principal purpose of the Agreement was for Plaintiffs and their affiliates to provide certain services to HAS Capital and its affiliates as purchasers "with the objective of acquiring multifamily properties."

8

47.     Under paragraph 3(b) (i) of the Agreement, HAS Capital agreed that it would be responsible with Plaintiffs for property negotiations, including that "[i]f a 'qualifying' call between the Seller and HAS as Buyer is required. . . . HAS will participate on the call and provide sufficient evidence of capital to close and discretion as required."

48.     Pursuant to the Agreement, compensation to Plaintiffs and their affiliates in exchange for performance (collectively "the Compensation") was as follows:

a.  An "Acquisition Fee" totaling 1% of the purchase price of any underlying asset, 0.75% of which would be paid at closing of the acquisition, and 0.25% of which would be paid at permanent debt financing of any given real estate asset that HAS Capital consummated pursuant to the Agreement;

b.  An "Ongoing Property Management Fee" - 4.0% of collected gross revenues, paid monthly;

c.  A "Construction Management Fee" - 5.0% of all renovation/value add construction costs; paid as drawn from a construction reserve. No construction management fee would be paid on normal periodic repairs less than $25,000 in total;

d.  A "Disposition Fee" - 0.50% of the gross sales price of the underlying asset at its eventual sale; and

e.  A "Profit Participation Fee" - 10% of ongoing Net Cash Flow after an Internal Rate of Return on the total investment by HAS Capital reached 8.0%. Such internal rate of return would be calculated on a "Private Equity Basis" assuming a market sale beginning on the 3rd anniversary of the initial intermediate term financing of the underlying asset; regardless of whether a sale was actually

9

consummated. The Internal Rate of Return would be based upon the equity

investment of HAS Capital remaining immediately following the initial

intermediate term financing.

**The Balmoral Transaction**

49.     On or about June 1, 2015, with HAS Capital's and Wheeler's approval, consent,

and assurance that HAS Capital and its affiliate as purchaser had control of and discretion over

sufficient acquisition funds, Plaintiffs sent to the Balmoral Seller and its broker Spain a Letter of

Intent ("the Balmoral LOI") for CK Property Management or an affiliated entity to purchase

from the Balmoral Seller for $42,744,000 in cash "All the real property that comprises [the

Balmoral Property], which includes 312 residential apartment units in addition to all personal

property and intangibles associated with the [P]roperty."

50.     On or about June 1, 2015, the Balmoral Seller advised Plaintiffs that it had

included CK Property Management and its affiliate as purchaser in the final selection process to

purchase the Balmoral Property.

51.     Thereafter, on June 1, 2015, the Balmoral Seller sent to Kennedy the Balmoral

buyer-questionnaire, seeking pertinent information about Plaintiffs and HAS Capital and its

affiliate as purchaser.

52.     Thereafter, on June 1, 2015, after completing Plaintiffs' portion of the document,

Kennedy forwarded the Balmoral buyer-questionnaire to Wheeler and Peterson for HAS Capital

to complete questions directed to it.

53.     On or about June 2, 2015 and at all times relevant pertaining to the Balmoral

transaction, Wheeler, Peterson, HAS Capital, Decator, and Decator LLC represented to the

10

Balmoral Seller, Plaintiffs, and others in the Balmoral buyer-questionnaire (collectively "the Balmoral Representations") that:

    a.   The entity or person providing capital to consummate the Balmoral transaction was "Confidential — Equity funds [to be] confirm[ed] through bank intermediary . . . No approval authority required";

    b.   "HAS Capital is [sic] fund manager with over $400 million in assets under advisement and discretionary equity capital commitments exceeding over $1 billion for investment in real estate and real estate related assets";

    c.   "Equity is provided through an on-shore investment entity wholly owned by an investor [the Sovereign Fund] with capital in excess of $1 billion in US equity. Equity deployment is HAS Capital discretionary";

    d.   "The equity source [the Sovereign Fund] has reviewed internal confidential underwriting and credit review analysis provided by HAS Capital as part of [its] normal credit and disclosure process";

    e.   The amount of equity to be used to acquire the Balmoral Property was "Equity sufficient to pay [sic] purchase price plus associated closing costs and to commence stated improvements"; and

    f.   "We have closed transactions of a similar size with the equity source[']s US intermediary within the past 6 months."

    54.   On June 3, 2015, at the direction and on behalf of HAS Capital and its affiliate as purchaser, Plaintiffs sent to Spain and the Balmoral Seller a best-and-final offer ("the Balmoral BFO") and the Balmoral buyer-questionnaire, as completed by HAS Capital, to purchase the Balmoral Property for $44,000,000 in cash.

55.     On or about June 3, 2015, Kennedy advised Wheeler that the Balmoral Seller would want a clear articulation of how Wheeler or anyone else could confirm that sufficient funds were immediately available for the entire $44,000,000 cash transaction for the Balmoral Property.

56.     On or about June 3 or June 4, 2015, Spain informed Plaintiffs that the Balmoral Seller acknowledged receipt of the Balmoral BFO.

57.     On or about June 4, 2015, the Balmoral Seller sent to Plaintiffs and HAS Capital a copy of the Balmoral PSA.

**The Specially Arranged June 9, 2015 Qualifying Conference Call**

58.     On or about June 8, 2015, Decator informed Wheeler and Peterson that HAS Capital's "banker at BMO Harris [wa]s willing to verify [their] funds by telephone."

59.     The banker to whom Decator referred on or about June 8, 2015 was Apostolou at BMO Harris.

60.     On June 9, 2015, in a letter to the Balmoral Seller and Plaintiffs, Wheeler stated that "[w]e will have the call confirming the availability of funds to HAS [Capital] in order to consummate the transaction this afternoon of June 9, 2015."

61.     On June 9, 2015, Plaintiffs, HAS Capital, Wheeler, Peterson, Decator, the Balmoral Seller, Spain, and Apostolou, on behalf of BMO Harris, participated in a specially arranged qualifying telephone conference call ("the Balmoral Qualifying Call").

62.     During the Balmoral Qualifying Call, Decator stated to Plaintiffs, the Balmoral Seller, and others that BMO Harris possessed, on HAS Capital's and its affiliate as purchaser's behalf, liquid and drawable funds necessary to consummate and close the $44,000,000 Balmoral transaction, and that the funds were available at HAS Capital's and Wheeler's discretion.

63.     Also during the Balmoral Qualifying Call, Apostolou, on behalf of BMO Harris, stated to Plaintiffs, the Balmoral Seller, and others that BMO Harris possessed, on HAS Capital's and its affiliate as purchaser's behalf, liquid and drawable funds necessary to consummate and close the $44,000,000 Balmoral transaction, and that the funds were available at HAS Capital's and Wheeler's discretion.

64.     On or about June 9, 2015, the Balmoral Seller accepted HAS Capital or its affiliated entity as the selected purchaser based on the Balmoral BFO, the Balmoral buyer-questionnaire, and the Balmoral Qualifying Call.

65.     But for the representations made by Defendants in the Balmoral BFO, the Balmoral buyer-questionnaire, and the Balmoral Qualifying Call, the Balmoral Seller would not have selected HAS Capital and its affiliate as purchaser.

66.     Prior to, on and after June 9, 2015, Decator reviewed the Balmoral PSA, sent to HAS Capital on or about June 4, 2015, and sent his preliminary comments on the Balmoral PSA to Kennedy, Peterson, and Wheeler.

67.     Between June 19, 2015 and June 24, 2015, Decator sent to the Balmoral Seller's counsel a revised Balmoral PSA with his comments.

68.     On June 24, 2015, Decator told Kennedy, Mayer, and Wheeler that "I have a call with [the Balmoral Seller]'s lawyer tomorrow afternoon to discuss this latest draft of the contract and see if we can narrow the open issues."

69.     On June 30, 2015, Decator sent to the Balmoral Seller's counsel another revised Balmoral PSA with his comments.

70.     Between June 30, 2015 and July 7, 2015, Decator and the Balmoral Seller's counsel exchanged revised drafts of the Balmoral PSA with comments.

13

71.     On or about July 7, 2015, Decator had a specially-arranged telephone call with the Balmoral Seller's counsel to discuss the Balmoral PSA.

72.     On July 7, 2015, Kennedy asked Decator if the specially-arranged telephone call with the Balmoral Seller's counsel went well.

73.     On July 7, Decator informed Kennedy that "It went well. I should have a revised draft of the [Balmoral PSA] out by tomorrow, which should be final and ready to sign."

74.     On July 8, 2015, Decator sent a revised draft of the Balmoral PSA to the Balmoral Seller.

75.     On July 8, 2015, Decator informed Kennedy that "We still need the [Balmoral] Seller to complete the missing Exhibits. I will probably sign the agreement for Toronto Peachtree, LLC, rather than [Wheeler]."

76.     Thereafter, on or about July 8, 2015, the Balmoral Seller returned a final version of the Balmoral PSA to Decator for HAS Capital's, Decator's, or both of their signatures on behalf of Toronto Peachtree.

77.     On or about July 22, 2015, the Balmoral Seller informed Wheeler and Decator that the Balmoral Seller was ready and willing to sign and otherwise execute the Balmoral PSA provided to it by Decator.

78.      Between July 22, 2015 and July 27, 2015, Decator, Wheeler, HAS Capital and Toronto Peachtree refused to sign the Balmoral PSA.

79.     On or about July 27, 2015, Decator, Wheeler, and HAS Capital and its affiliate as purchaser still had not executed the Balmoral PSA, despite repeated requests from Spain, Stern, Kennedy, Mayer, and others to do so.

14

80.    On or about July 27, 2015, the Balmoral Seller tendered to HAS Capital a revocation of the Balmoral Seller's offer to sell the Balmoral Property to HAS Capital and its affiliate as purchaser.

**The Cypress Point Transaction**

81.    On or about June 25, 2015, with HAS Capital's and Wheeler's approval, consent, and assurance that HAS Capital and its affiliate as purchaser had control of and discretion over sufficient acquisition funds, Plaintiffs sent to the Cypress Point Seller and its broker Bloom a Letter of Intent ("the Cypress Point LOI") for CK Property Management or an affiliated entity to purchase from the Cypress Point Seller for $47,500,000 in cash "All the real property that comprises [the Cypress Point Property], which includes 306 residential apartment units in addition to all personal property and intangibles associated with the [P]roperty."

82.    On or about June 26, 2015, the Cypress Point Seller advised Plaintiffs that it had included CK Property Management and its affiliate as purchaser in the final selection process to purchase the Cypress Point Property.

83.    Thereafter, on June 26, 2015, the Cypress Point Seller sent to Kennedy the Cypress Point buyer-questionnaire, seeking pertinent information about Plaintiffs and HAS Capital and its affiliate as purchaser.

84.    Between June 26, 2015 and July 1, 2015, after completing Plaintiffs' portion of the document, Kennedy forwarded the Cypress Point buyer-questionnaire to Wheeler and Peterson for HAS Capital to complete questions directed to it.

85.    On or about July 1, 2015 and at all times relevant pertaining to the Cypress Point transaction, Wheeler, Peterson, HAS Capital, Decator, and Decator LLC represented to the

Cypress Point Seller, Plaintiffs, and others in the Cypress Point buyer-questionnaire (collectively "the Cypress Point Representations") that:

     a. "[HAS Capital] will consummate the purchase of the property with 100% equity";

     b. "HAS Capital LLC is a real estate 'sub-advisor' for a domestic investor[through the Sovereign Fund] with over $1 billion committed to real estate acquisitions throughout the US";

     c. "All capital is funded by one investor[the Sovereign Fund]";

     d. "Sufficient equity to close the acquisition is drawable from the bank";

     e. That there are no "other approvals to be obtained to invest this equity in this asset";

     f. "[HAS Capital is] currently concluding PSA negotiations on one contract on a 312 unit property in metro Atlanta"; and

     g. "This acquisition will assist us in solidifying our footprint in greater Atlanta; a market we look to invest over $150 million in over the next 12 months."

86. On July 1, 2015, at the direction of Wheeler and on behalf of HAS Capital and its affiliate as purchaser, Plaintiffs sent to Bloom and the Cypress Point Seller a best-and-final offer ("the Cypress Point BFO") and the Cypress Point buyer-questionnaire, as completed by HAS Capital, to purchase the Cypress Point Property for $48,200,000 in cash.

87. Between July 1 and July 6, 2015, Bloom informed Plaintiffs that the Cypress Point Seller acknowledged receipt of the Cypress Point BFO.

**The Specially Arranged July 6, 2015 Qualifying Conference Call**

88.    On or about July 6, 2015, Plaintiffs, HAS Capital, Wheeler, Peterson, Decator, the Cypress Point Seller, Bloom, and Apostolou, on behalf of BMO Harris, participated in a specially arranged qualifying telephone conference call ("the Cypress Point Qualifying Call").

89.    During the Cypress Point Qualifying Call, Decator stated to Plaintiffs, the Cypress Point Seller, and others that BMO Harris possessed, on HAS Capital's and its affiliate as purchaser's behalf, liquid and drawable funds necessary to consummate and close the $48,200,000 Cypress Point transaction, that the funds were available at HAS Capital's and Wheeler's discretion, and that the funds were coming from a "Mideast sovereign wealth fund."

90.    Also during the Cypress Point Qualifying Call, Apostolou, on behalf of BMO Harris, stated to Plaintiffs, the Cypress Point Seller, and others that BMO Harris possessed, on HAS Capital's and its affiliate as purchaser's behalf, liquid and drawable funds necessary to consummate and close the $48,200,000 Cypress Point transaction, that the funds were available at HAS Capital's and Wheeler's discretion, that the cash needed for the transaction "was only an infinitesimal amount of the whole [amount in the Sovereign Fund]" available under HAS Capital's and Wheeler's discretion, and that "I just need to know where and when to send the funds."

91.    Thereafter, on July 6, 2015, HAS Capital and Wheeler directed Plaintiffs to increase the Cypress Point BFO to $48,500,000 on behalf of HAS Capital and its affiliate as purchaser.

92.    Thereafter, on July 7, 2015, Plaintiffs sent to the Cypress Point Seller a revised best-and-final offer for HAS Capital and its affiliate as purchaser to purchase the Cypress Point Property for $48,500,000 in cash ("the Revised Cypress Point BFO").

17

93.     Thereafter, on July 7, 2015 at 4:24 PM, the Cypress Point Seller acknowledged receipt of the Revised Cypress Point BFO and accepted HAS Capital and its affiliate as the selected purchaser based on the Revised Cypress Point BFO, the Cypress Point buyer-questionnaire, and the Cypress Point Qualifying Call.

94.     But for the representations made by Defendants in the Revised Cypress Point BFO, the Cypress Point buyer-questionnaire, and the Cypress Point Qualifying Call, the Cypress Point Seller would not have selected HAS Capital and its affiliate as purchaser.

95.     On July 7, 2015 at 5:13 PM, Decator stated to Kennedy that "I spoke with my Co-Chairman this afternoon about this project. He knows the project well and is excited for us to acquire it. Great job of getting this one for us."

96.     On July 8, 2015, the Cypress Point Seller sent to Decator, on behalf of HAS Capital and the Sovereign Fund, a copy of the purchase-sale agreement for the Cypress Point Property ("the Cypress Point PSA"); the email was copied to Wheeler, Peterson, and Plaintiffs.

97.     On July 21, 2015, the Cypress Point Seller advised its broker, Bloom, that "[Decator] ha[d] not given any comments yet [on the Cypress Point PSA] and [Decator and HAS Capital] got the draft on Wednesday, July 8" and that it had been "[a]lmost two weeks and no comments."

98.     Between July 8, 2015 and July 22, 2015, HAS Capital, Wheeler, and Decator did not relay or communicate any comments regarding the Cypress Point PSA to the Cypress Point Seller.

99.     On or about July 22, 2015, Decator on behalf of HAS Capital and its affiliate as purchaser sent to the Cypress Point Seller the first revised draft of the Cypress Point PSA; the email was copied to Wheeler, Peterson, and Plaintiffs.

100.    On or about July 23, 2015, the Cypress Point Seller, through Richards, sent to Decator a second revised draft of the Cypress Point PSA.

101.    On or about July 24, 2015, Decator advised Richards that he had "not had a chance yet to fully review [Richards's] revised draft" of the July 23, 2015 Cypress Point PSA.

102.    On or about July 28, 2015, Decator sent to Richards the third revised draft of the Cypress Point PSA.

103.    On July 29, 2015, Richards sent to Decator a final version of the Cypress Point PSA that was agreeable to the Cypress Point Seller and ready for execution on behalf of the Cypress Point Seller.

104.    Between July 29, 2015 and August 5, 2015, Decator, Wheeler, and other agents of HAS Capital refused to take phone calls and to respond to emails relating to execution by them of the Cypress Point PSA and refused to execute the final Cypress Point PSA.

105.    By August 5, 2015, Richards had not received any response from Decator, Wheeler, or any other agent of HAS Capital and the Sovereign Fund regarding execution of the Cypress Point PSA.

106.    On August 5, 2015, HAS Capital and its affiliate as purchaser, Wheeler, and Decator still had not executed the Cypress Point PSA, despite repeated requests from the Cypress Point Seller, Plaintiffs, and others to do so.

107.    On August 5, 2015, the Cypress Point Seller withdrew its offer to sell the Cypress Point Property to HAS Capital and its affiliate as purchaser.

**The St. Andrews Transaction**

108.    On or about July 9, 2015, with HAS Capital's and Wheeler's approval, consent, and assurance that HAS Capital and its affiliate as purchaser had control of and discretion over

19

sufficient acquisition funds, Plaintiffs sent to the St. Andrews Seller and its broker Henry a Letter of Intent ("the St. Andrews LOI") for CK Property Management or an affiliated entity to purchase from the St. Andrews Seller for $37,500,000 in cash "All the real property that comprises [the St. Andrews Property], which includes 228 residential apartment units in addition to all personal property and intangibles associated with the [P]roperty."

109.    On or about July 14, 2015, the St. Andrews Seller advised Plaintiffs that it had included CK Property Management and its affiliate as purchaser in the final selection process to purchase the St. Andrews Property.

110.    Thereafter, on July 14, 2015, the St. Andrews Seller sent to Kennedy the St. Andrews buyer-questionnaire, seeking pertinent information about Plaintiffs and HAS Capital and its affiliate as purchaser.

111.    Between July 14, 2015 and July 15, 2015, after completing Plaintiffs' portion of the document, Kennedy forwarded the St. Andrews buyer-questionnaire to Wheeler and Peterson for HAS Capital to complete questions directed to it.

112.    On or about July 15, 2015 and at all times relevant pertaining to the St. Andrews transaction, Wheeler, Peterson, HAS Capital, Decator, and Decator LLC represented to the St. Andrews Seller, Plaintiffs, and others in the St. Andrews buyer-questionnaire (collectively "the St. Andrews Representations") that:

    a.   "HAS Capital is a real estate 'sub-advisor' for a domestic investor[the Sovereign Fund] with over $1 billion committed to real estate acquisitions throughout the US. The equity allocation is discretionary";

    b.   "Prior to submission of best and final the equity funding on an all cash basis has been approved";

     c.   "HAS Capital is currently closing on a 300+ unit apartment with its operating partner, ChrisKen Group, LLC, in metro Atlanta and is negotiating the purchase contract on another 300+ unit property in metro Atlanta";

     d.   "[HAS Capital] will consummate the purchase of the [St. Andrews] [P]roperty with 100% equity";

     e.   "The property is being acquired with 100% equity";

     f.   "Stephen Wheeler and Adam Peterson from HAS Capital have reviewed the underwriting and no other approvals are necessary."

113.    On July 16, 2015, at the direction and on behalf of HAS Capital and its affiliate as purchaser, Plaintiffs sent to Henry and the St. Andrews Seller a best-and-final offer ("the St. Andrews BFO") and the St. Andrews buyer-questionnaire, as completed by HAS Capital, to purchase the St. Andrews Property for $38,000,000 in cash.

114.    Between July 16 and July 21, 2015, Henry informed Plaintiffs that the St. Andrews Seller acknowledged receipt of the St. Andrews BFO.

**The Specially Arranged July 21, 2015 Qualifying Conference Call**

115.    On July 17, 2015, Henry informed Plaintiffs, HAS Capital, Wheeler, and Peterson that "The [St. Andrews Seller] would like to set up some interview calls before they make a decision."

116.    On July 20, 2015, Henry asked Kennedy if an interview call could take place on July 21, 2015, at 10:30 AM EST.

117.    On July 20, 2015 at 11:44 AM, Kennedy asked Wheeler if an interview call with the St. Andrews Seller could take place on July 21, 2015 at 10:30 AM EST.

118. On July 20, 2015 at 11:48 AM, Wheeler told Kennedy, Decator, Peterson, and Mayer that "We have to move a couple of things on our schedule. Let me see what we can do. In any case we will have a hard stop at 11:30 CST."

119. On July 21, 2015, , Plaintiffs, HAS Capital, Wheeler, Peterson, Decator, the St. Andrews Seller, Henry, and Apostolou, on behalf of BMO Harris, participated in a specially arranged qualifying telephone conference call ("the St. Andrews Qualifying Call")

120. During the St. Andrews Qualifying Call, Decator stated to Plaintiffs, the St. Andrews Seller, and others that BMO Harris possessed, on HAS Capital's and its affiliate as purchaser's behalf, liquid and drawable funds necessary to consummate and close the $38,000,000 St. Andrews transaction, and that the funds were available at HAS Capital's and Wheeler's discretion.

121. Also during the St. Andrews Qualifying Call, Apostolou, on behalf of BMO Harris, stated to Plaintiffs, the St. Andrews Seller, and others that BMO Harris possessed, on HAS Capital's and its affiliate as purchaser's behalf, liquid and drawable funds necessary to consummate and close the $38,000,000 St. Andrews transaction, and that the funds were available at HAS Capital's and Wheeler's discretion.

122. On July 22, 2015, HAS Capital and Wheeler directed Plaintiffs to increase the St. Andrews BFO to $38,200,000.

123. Thereafter, on July 22, 2015, Plaintiffs sent to the St. Andrews Seller a revised best-and-final offer for HAS Capital and its affiliate as purchaser to purchase the St. Andrews Property for $38,200,000 ("the Revised St. Andrews BFO").

124.     Shortly thereafter, the St. Andrews Seller informed Plaintiffs that the Revised St. Andrews BFO was rejected and that HAS Capital and its affiliate as purchaser were not selected as purchaser of the St. Andrews Property.

## THE FRAUD UNCOVERED

125.     On or about July 29, 2015, Plaintiffs through Kennedy called Decator to ask why the Balmoral and Cypress Point PSAs had not been executed and why funding of the transactions had not begun.

126.     During the July 29, 2015 telephone call with Decator, Decator told Kennedy that there was no money available and there would be no money "because of the Chinese stock market crash."

127.     During the July 29, 2015 telephone call to Decator, Kennedy asked "What does the Chinese stock market have to do with a Mideast Sovereign Fund?"

128.     During the July 29, 2015 telephone call to Decator, Decator told Kennedy that the "[Sovereign Fund] was not a sovereign fund from the Mideast," and that it was not involved in the funding of any of the prospective real estate acquisitions for the Balmoral, Cypress Point, and St. Andrews Properties.

129.     Thereafter, on July 29, 2015, Peterson, on behalf of HAS Capital, confirmed to Plaintiffs, through Kennedy, that there was no Sovereign Fund, in explaining to Kennedy that HAS Capital was "in fact trying to find an investor" for the Balmoral and Cypress Point transactions.

130.     On July 30, 2015, HAS Capital, through Peterson, told Plaintiffs, through Kennedy, that "I spoke with [Bloom]. I explained that [Decator]'s co chairman [sic] just got back

from Asia and we have a number of deals going on. He [Bloom] said we are not missing any deadlines, just that his client is antsy. Everything is fine. Get some rest.

## COUNT I – FRAUDULENT MISREPRESENTATION
### (HAS Capital)

131.    Plaintiffs incorporate the allegations contained in paragraphs 1–130 as if fully set forth herein.

132.    Wheeler made the following false statements of fact to Plaintiffs, the Balmoral Seller, Cypress Point Seller, St. Andrews Seller, and others (collectively "the Wheeler Misrepresentations"):

   a.  The Balmoral Representations, as set forth in paragraph 53 (a)-(f);

   b.  The Cypress Point Representations, as set forth in paragraph 85 (a)-(g);

   c.  The St. Andrews Representations, as set in paragraph 103 (a)–(f);

   d.  That the capital and 100% equity for the Balmoral, Cypress Point, and St. Andrews real estate transactions was to come from a single [domestic] investor through the Sovereign Fund;

   e.  That the Sovereign Fund's assets and capital were under HAS Capital's possession, control, and discretion through BMO Harris and Apostolou to fund the Balmoral, Cypress Point, and St. Andrews real estate transactions for cash with 100% equity;

   f.  That the "[Sovereign Fund's] appetite for large properties was unlimited," it had "unlimited dollars to invest," and it desired to consummate multi-million dollar real estate acquisitions of properties of 300 units or more, ranging in price from $30,000,000 to $100,000,000;

g.  That on April 13, 2015, as of 9:56 AM, Wheeler would have $50,000,000 available within three weeks;

h.  That on June 9, 2015, HAS Capital could confirm the availability of funds in order to consummate the Balmoral transaction during the requisite Balmoral Qualifying Call, as set forth in paragraphs 61–63;

i.  That sufficient capital existed for HAS Capital and its affiliate as purchaser to pay the purchase price plus associated closing costs and to commence necessary improvements for the Balmoral, Cypress Point, and St. Andrews Properties; and

j.  That BMO Harris possessed, on HAS Capital's and its affiliate as purchaser's behalf, liquid and drawable funds and capital to purchase with 100% equity the Balmoral, Cypress Point, and St. Andrews Properties, and that the funds were available at HAS Capital's and Wheeler's discretion.

133.    Wheeler knew or believed the Wheeler Misrepresentations to be false at the times he made them to Plaintiffs, the Balmoral Seller, Cypress Point Seller, St. Andrews Seller, and others.

134.    Decator made the following false statements of fact to Plaintiffs, the Balmoral Seller, Cypress Point Seller, St. Andrews Seller, and others (collectively "the Decator Misrepresentations"):

a.  The Balmoral Representations, as set forth in paragraph 53 (a)-(f);

b.  The Cypress Point Representations, as set forth in paragraph 85 (a)-(g);

c.  The St. Andrews Representations, as set in paragraph 103 (a)–(f);

d.   That the capital and 100% equity for the Balmoral, Cypress Point, and St. Andrews real estate transactions was to come from a single [domestic] investor through the Sovereign Fund;

e.   That the Sovereign Fund's assets and capital were under HAS Capital's possession, control, and discretion through BMO Harris and Apostolou to fund the Balmoral, Cypress Point, and St. Andrews real estate transactions for cash with 100% equity;

f.   That the "[Sovereign Fund's] appetite for large properties was unlimited," it had "unlimited dollars to invest," and it desired to consummate multi-million dollar real estate acquisitions of properties of 300 units or more, ranging in price from $30,000,000 to $100,000,000;

g.   That on June 9, 2015, HAS Capital could confirm the availability of funds in order to consummate the Balmoral transaction during the requisite Balmoral Qualifying Call, as set forth in paragraphs 61–63;

h.   That sufficient capital existed for HAS Capital and its affiliate as purchaser to pay the purchase price plus associated closing costs and to commence necessary improvements for the Balmoral, Cypress Point, and St. Andrews Properties; and

i.   That BMO Harris possessed, on HAS Capital's and its affiliate as purchaser's behalf, liquid and drawable funds and capital to purchase with 100% equity the Balmoral, Cypress Point, and St. Andrews Properties, and that the funds were available at HAS Capital's and Wheeler's discretion.

135. Decator knew or believed the Decator Misrepresentations to be false at the times he made them to Plaintiffs, the Balmoral Seller, Cypress Point Seller, St. Andrews Seller, and others.

136. In making the Wheeler and Decator Misrepresentations, Wheeler and Decator acted as agents of HAS Capital with apparent and actual authority.

137. Through the Wheeler and Decator Misrepresentations, Wheeler, Decator, and other HAS Capital agents or employees intended to induce Plaintiffs to act in the following ways:

    a. To execute the Agreement between HAS Capital and Plaintiffs and their affiliates;

    b. To provide substantial expertise, skill, knowledge, effort, labor, time, and other resources to facilitate the Balmoral, Cypress Point, and St. Andrews real estate transactions as HAS Capital's and its affiliates as purchasers' operating partners;

    c. To use Plaintiffs' brokerage contacts and Plaintiffs' reputation with those contacts to find, underwrite, and otherwise facilitate real estate acquisitions for HAS Capital's benefit and its affiliates as purchasers' benefit; and

    d. To perform under the Agreement between HAS Capital and Plaintiffs and their affiliates.

138. Plaintiffs justifiably relied on the Wheeler and Decator Misrepresentations to their detriment.

139. But for the Wheeler and Decator Misrepresentations, Plaintiffs would not have done the following:

    a. Executed the Agreement between HAS Capital and Plaintiffs and their affiliates;

    b.   Provided substantial expertise, skill, knowledge, effort, labor, time, and other resources to facilitate the Balmoral, Cypress Point, and St. Andrews real estate transactions as HAS Capital's and its affiliates as purchasers' operating partners;

    c.   Used Plaintiffs' brokerage contacts and Plaintiffs' reputation with those contacts to find, underwrite, and otherwise facilitate real estate transactions for HAS Capital's benefit and its affiliates as purchasers' benefit; and

    d.   Performed under the Agreement between HAS Capital and Plaintiffs and their affiliates.

140.    As a direct and proximate result of the Wheeler and Decator Misrepresentations and Plaintiffs' detrimental reliance on them, Plaintiffs have been damaged in the following ways:

    a.   Lost opportunities with other investors to act as those investors' operating partners;

    b.   Lost reputation and goodwill among Plaintiffs' brokerage contacts;

    c.   Loss of substantial costs committed to finding the properties, underwriting, performing due diligence, and other costs in connection with the Balmoral, Cypress Point, and St. Andrews real estate transactions; and

    d.   Loss of fees, including: Acquisition Fee, Ongoing Property Management Fee, Construction Management Fee, Disposition Fee, and Profit Participation Fee.

**WHEREFORE**, Plaintiffs pray that judgment be entered in their favor and against HAS Capital, and that Plaintiffs be awarded compensatory damages in an amount exceeding $50,000, plus costs of this suit and any other relief this Court deems just and reasonable.

## COUNT II – FRAUDULENT MISREPRESENTATION
### (Wheeler)

141.    Plaintiffs incorporate the allegations contained in paragraphs 1–130, 132–133, and 136–140 as if fully set forth herein.

142.    In making the Wheeler Misrepresentations, if Wheeler did not act as an agent of HAS Capital with apparent and actual authority, then he acted in an individual capacity.

**WHEREFORE**, Plaintiffs pray that judgment be entered in their favor and against Wheeler, and that Plaintiffs be awarded compensatory damages in an amount exceeding $50,000, plus costs of this suit and any other relief this Court deems just and reasonable.

## COUNT III – FRAUDULENT MISREPRESENTATION
### (Decator LLC)

143.    Plaintiffs incorporate the allegations contained in paragraphs 1–130, 134–135, and 136–140 as if fully set forth herein.

144.    In making the Decator Misrepresentations, Decator acted as an agent of Decator LLC with apparent and actual authority.

**WHEREFORE**, Plaintiffs pray that judgment be entered in their favor and against Decator LLC, and that Plaintiffs be awarded compensatory damages in an amount exceeding $50,000, plus costs of this suit and any other relief this Court deems just and reasonable.

## COUNT IV – FRAUDULENT MISREPRESENTATION
### (Decator)

145.    Plaintiffs incorporate the allegations contained in paragraphs 1–130, 134–135, and 136–140 as if fully set forth herein.

146.    In making the Decator Misrepresentations, if Decator did not act as an agent of HAS Capital and Decator LLC with apparent and actual authority, then he acted in an individual capacity.

**WHEREFORE**, Plaintiffs pray that judgment be entered in their favor and against Decator, and that Plaintiffs be awarded compensatory damages in an amount exceeding $50,000, plus costs of this suit and any other relief this Court deems just and reasonable.

## COUNT V – FRAUDULENT MISREPRESENTATION
### (BMO Harris)

147.    Plaintiffs incorporate the allegations contained in paragraphs 1–130 as if fully set forth herein.

148.    Apostolou made the following false statements of fact to Plaintiffs, the Balmoral Seller, Cypress Point Seller, St. Andrews Seller, and others (collectively "the BMO Misrepresentations"):

      a.    That BMO Harris possessed, on HAS Capital's and its affiliate as purchaser's behalf, liquid and drawable funds and capital to purchase with 100% equity the Balmoral, Cypress Point, and St. Andrews Properties, and that the funds were available at HAS Capital's and Wheeler's discretion; and

      b.    That cash needed for the Cypress Point transaction "was only an infinitesimal amount of the whole [amount in the Sovereign Fund]" available under HAS Capital's and Wheeler's discretion.

149.    Apostolou knew or believed the BMO Misrepresentations to be false at the times he made them to Plaintiffs, the Balmoral Seller, Cypress Point Seller, St. Andrews Seller, and others.

150.    At all times relevant, BMO Harris was in the business of supplying information for the guidance of others in business transactions.

151.    At all times relevant, BMO Harris's business of supplying information for the guidance of others in business transactions included verifying the existence of funds in its

possession on a third-party's behalf for the participation in and consummation of real estate transactions.

152.     In making the BMO Misrepresentations, Apostolou acted as an agent of BMO Harris with apparent and actual authority.

153.     In making the BMO Misrepresentations, Apostolou acted in the course of his employment with BMO Harris and in furtherance of the business of BMO Harris.

154.     Plaintiffs justifiably relied on the BMO Misrepresentations to their detriment.

155.     Through the BMO Misrepresentations, Apostolou intended to induce Plaintiffs and the Balmoral, Cypress Point, and St. Andrews Sellers to act in the following ways:

    a.   To provide substantial expertise, skill, knowledge, effort, labor, time, and other resources to facilitate the Balmoral, Cypress Point, and St. Andrews real estate transactions as HAS Capital's and the Sovereign Fund's operating partners;

    b.   To use Plaintiffs' brokerage contacts and Plaintiffs' reputation with those contacts to find, underwrite, and otherwise facilitate real estate acquisitions for HAS Capital's benefit and the Sovereign Fund's benefit; and

    c.   To perform under the Agreement between HAS Capital and Plaintiffs and their affiliates.

156.     But for the BMO Misrepresentations, Plaintiffs would not have acted in the following manners:

    a.   Provided substantial expertise, skill, knowledge, effort, labor, time, and other resources to facilitate the Balmoral, Cypress Point, and St. Andrews real estate transactions as HAS Capital's and its affiliates as purchasers' operating partners;

b. Used Plaintiffs' brokerage contacts and Plaintiffs' reputation with those contacts to find, underwrite, and otherwise facilitate real estate transactions for HAS Capital's benefit and its affiliates as purchasers' benefit; and

c. Performed under the Agreement between HAS Capital and Plaintiffs and their affiliates.

157. As a direct and proximate result of the BMO Misrepresentations and Plaintiffs' detrimental reliance on them, Plaintiffs have been damaged in the following ways:

a. Lost opportunities with other investors to act as those investors' operating partners;

b. Lost reputation and goodwill among Plaintiffs' brokerage contacts;

c. Loss of substantial costs committed to finding the properties, underwriting, performing due diligence, and other costs in connection with the Balmoral, Cypress Point, and St. Andrews real estate transactions; and

d. Loss of fees, including: Acquisition Fee, Ongoing Property Management Fee, Construction Management Fee, Disposition Fee, and Profit Participation Fee.

**WHEREFORE**, Plaintiffs pray that judgment be entered in their favor and against BMO Harris, and that Plaintiffs be awarded compensatory damages in an amount exceeding $50,000, plus costs of this suit and any other relief this Court deems just and reasonable.

## COUNT VI – FRAUDULENT MISREPRESENTATION
### (Apostolou)

158. Plaintiffs incorporate the allegations contained in paragraphs 1–130, 148–149, and 150–157 as if fully set forth herein.

159. In making the BMO Misrepresentations, if Apostolou did not act as an agent of BMO Harris with apparent and actual authority, then he acted in an individual capacity.

**WHEREFORE**, Plaintiffs pray that judgment be entered in their favor and against Apostolou, and that Plaintiffs be awarded compensatory damages in an amount exceeding $50,000, plus costs of this suit and any other relief this Court deems just and reasonable.

## COUNT VII – NEGLIGENT MISREPRESENTATION
### (HAS Capital)

160.    Plaintiffs incorporate the allegations contained in paragraphs 1–130, 132, 134, and 136–140 as if fully set forth herein.

161.    The Agreement provided that HAS Capital had a duty to "participate on [qualifying telephone calls with prospective sellers] and provide sufficient evidence of capital to close and discretion as required."

162.    HAS Capital, through Wheeler and Decator owed a duty to Plaintiffs to communicate accurate information regarding the existence and extent of the capital and equity under HAS Capital's discretion and control for the purpose of initiating, participating in, and consummating the Balmoral, Cypress Point, and St. Andrews real estate transactions.

163.    Disregarding said duty, Wheeler and Decator, on behalf of HAS Capital, negligently and carelessly made the Wheeler and Decator Misrepresentations.

**WHEREFORE**, Plaintiffs pray that judgment be entered in their favor and against HAS Capital, and that Plaintiffs be awarded compensatory damages in an amount exceeding $50,000, plus costs of this suit and any other relief this Court deems just and reasonable.

## COUNT VIII – NEGLIGENT MISREPRESENTATION
### (Wheeler)

164.    Plaintiffs incorporate the allegations contained in paragraphs 1–130, 132, 136–140, and 142 as if fully set forth herein.

165.    Wheeler owed a duty to Plaintiffs to communicate accurate information regarding the existence and extent of the capital and equity under HAS Capital's and his discretion and

33

control for the purpose of initiating, participating in, and consummating the Balmoral, Cypress Point, and St. Andrews real estate transactions.

166.     Disregarding said duty, Wheeler negligently and carelessly made the Wheeler Misrepresentations.

**WHEREFORE**, Plaintiffs pray that judgment be entered in their favor and against Wheeler, and that Plaintiffs be awarded compensatory damages in an amount exceeding $50,000, plus costs of this suit and any other relief this Court deems just and reasonable.

## COUNT IX – NEGLIGENT MISREPRESENTATION
### (Decator LLC)

167.     Plaintiffs incorporate the allegations contained in paragraphs 1–130, 134, 136–140, and 144 as if fully set forth herein.

168.     Decator LLC, through Decator, owed a duty to Plaintiffs to communicate accurate information regarding the existence and extent of the capital and equity under HAS Capital's discretion and control for the purpose of initiating, participating in, and consummating the Balmoral, Cypress Point, and St. Andrews real estate transactions.

169.     Disregarding said duty, Decator, on behalf of Decator LLC, negligently and carelessly made the Decator Misrepresentations.

**WHEREFORE**, Plaintiffs pray that judgment be entered in their favor and against Decator LLC, and that Plaintiffs be awarded compensatory damages in an amount exceeding $50,000, plus costs of this suit and any other relief this Court deems just and reasonable.

## COUNT X – NEGLIGENT MISREPRESENTATION
### (Decator)

170.     Plaintiffs incorporate the allegations contained in paragraphs 1–130, 134, 136–140, and 146 as if fully set forth herein.

171.    Decator owed a duty to Plaintiffs to communicate accurate information regarding the existence and extent of the capital and equity under HAS Capital's discretion and control for the purpose of initiating, participating in, and consummating the Balmoral, Cypress Point, and St. Andrews real estate transactions.

172.    Disregarding said duty, Decator negligently and carelessly made the Decator Misrepresentations.

**WHEREFORE**, Plaintiffs pray that judgment be entered in their favor and against Decator, and that Plaintiffs be awarded compensatory damages in an amount exceeding $50,000, plus costs of this suit and any other relief this Court deems just and reasonable.

## COUNT XI – NEGLIGENT MISREPRESENTATION
### (BMO Harris)

173.    Plaintiffs incorporate the allegations contained in paragraphs 1–130, 148, and 150-157 as if fully set forth herein.

174.    BMO Harris, by its actual and apparent agent Apostolou, owed a duty to Plaintiffs to communicate accurate information regarding the existence and extent of the capital and assets under BMO Harris's control that was drawable and available to HAS Capital and Wheeler for the purpose of initiating, participating in, and consummating the Balmoral, Cypress Point, and St. Andrews real estate transactions.

175.    Disregarding said duty, Apostolou, on behalf of BMO Harris, negligently and carelessly made the BMO Misrepresentations.

**WHEREFORE**, Plaintiffs pray that judgment be entered in their favor and against BMO Harris, and that Plaintiffs be awarded compensatory damages in an amount exceeding $50,000, plus costs of this suit and any other relief this Court deems just and reasonable.

## COUNT XII – NEGLIGENT MISREPRESENTATION
### (Apostolou)

176.     Plaintiffs incorporate the allegations contained in paragraphs 1–130, 148, 150-157 and 159 as if fully set forth herein.

177.     At all times relevant, Apostolou was in the business of supplying information for the guidance of others in business transactions.

178.     At all times relevant, Apostolou's business of supplying information for the guidance of others in business transactions included verifying the existence of funds in its possession on a third-party's behalf for the consummation of real estate transactions.

179.     Apostolou owed a duty to Plaintiffs to communicate accurate information regarding the existence and extent of the capital and assets under BMO Harris's control that were drawable and available to HAS Capital and Wheeler for the purpose of participating in and consummating the Balmoral, Cypress Point, and St. Andrews real estate transactions.

180.     Disregarding said duty, Apostolou negligently and carelessly made the BMO Misrepresentations.

**WHEREFORE**, Plaintiffs pray that judgment be entered in their favor and against Apostolou, and that Plaintiffs be awarded compensatory damages in an amount exceeding $50,000, plus costs of this suit and any other relief this Court deems just and reasonable.

## COUNT XIII – NEGLIGENT SUPERVISION
### (BMO Harris)

181.     Plaintiffs incorporate the allegations contained in paragraphs 1–130, 148–157, 174–175, and 177–180 as if fully set forth herein.

182.     At all times and dates relevant to the Balmoral Qualifying Call, Cypress Point Qualifying Call, and St. Andrews Qualifying Call, Apostolou was employed by BMO Harris.

183. Apostolou's BMO Misrepresentations and pattern of misconduct created a reasonably foreseeable danger to third parties, including Plaintiffs.

184. Because of Apostolou's aforementioned pattern of misconduct during the Balmoral, Cypress Point, and St. Andrews Qualifying Calls, BMO Harris knew or should have known of Apostolou's particular unfitness for his position of employment at BMO Harris.

185. Because of Apostolou's pattern of misconduct during the Qualifying Calls, BMO Harris knew or should have known that Apostolou's employment with BMO Harris created a danger of harm to third persons, including Plaintiffs.

186. BMO Harris had a duty to exercise reasonable care in training, supervising, limiting, restraining, maintaining, or otherwise regulating Apostolou's conduct such that he would not create a danger of harm to third persons, including Plaintiffs.

187. Disregarding said duties, BMO Harris failed to safeguard third parties, including Plaintiffs, from harm caused by Apostolou, through one or more of the following acts or omissions by BMO Harris:

    a. Failing to adequately supervise Apostolou;

    b. Failing to timely discover misconduct by Apostolou;

    c. Failing to implement policies, rules, or other institutional mechanisms by which to timely detect misconduct by Apostolou;

    d. Failing to instruct Apostolou that the BMO Misrepresentations were inappropriate conduct in the course of his employment;

    e. Failing to discipline Apostolou for the aforementioned pattern of misconduct; and

    f. Failing to discharge Apostolou from employment with BMO Harris.

188.     As a direct and proximate result of the negligent acts or omissions by BMO

Harris, Apostolou's conduct during his course of employment at BMO Harris caused Plaintiffs to

be damaged in the following ways:

     a.   Lost opportunities with other investors to act as those investors' operating

          partners;

     b.   Lost reputation and goodwill among Plaintiffs' brokerage contacts;

     c.   Loss of substantial costs committed to finding the properties, underwriting,

          performing due diligence, and other costs in connection with the Balmoral,

          Cypress Point, and St. Andrews real estate transactions; and

     d.   Loss of fees, including: Acquisition Fee, Ongoing Property Management Fee,

          Construction Management Fee, Disposition Fee, and Profit Participation Fee.

**WHEREFORE**, Plaintiffs pray that judgment be entered in their favor and against BMO

Harris, and that Plaintiffs be awarded compensatory damages in an amount exceeding $50,000,

plus costs of this suit and any other relief this Court deems just and reasonable.

## COUNT XIV – BREACH OF CONTRACT
### (HAS Capital)

189.     Plaintiffs incorporate the allegations contained in paragraphs 1–130, 132–140,

and 161-163 as if fully set forth herein.

190.     The Agreement between HAS Capital and Plaintiffs is attached as Exhibit A.

191.     On April 18, 2015, Plaintiffs anticipated acting as the operating partners of HAS

Capital and its affiliates as purchasers of multi-million dollar real estate acquisitions of 300 units

or more, ranging in price from $30,000,000 to $100,000,000.

192. Under the Agreement, HAS Capital agreed to be solely responsible for "all acquisition or refinancing third-party costs, on an HAS approved property, whether such property closes or not."

193. The aforementioned out-of-pocket costs ("the Costs") to Plaintiffs included, but were not limited to, "legal, accounting, engineering, lender fees, title fees, and due diligence expenses."

194. HAS Capital agreed to "pay [the Costs] on a timely basis."

195. HAS Capital agreed to "participate on [qualifying telephone calls with prospective sellers] and provide sufficient evidence of capital to close and discretion as required" in preparing buyer-questionnaires.

196. HAS Capital had a contractual duty to represent true, sufficient evidence of capital to close and discretion as required in preparing buyer-questionnaires and during the Balmoral, Cypress Point, and St. Andrews Qualifying Calls.

197. The Agreement between HAS Capital and Plaintiffs contained the Costs and Compensation to which Plaintiffs were entitled in of any given real estate transaction.

198. Under the Agreement, Plaintiffs anticipated and expected payment of Compensation and Costs, where the Compensation would be calculated pursuant to an amount substantially similar to the agreed purchase prices for the Balmoral and Cypress Point Properties.

199. During the Balmoral, Cypress Point, and St. Andrews Qualifying Calls, and within the Balmoral, Cypress Point, and St. Andrews buyer-questionnaires, HAS Capital represented that it had sufficient liquid capital to consummate the transactions therein contemplated.

200. HAS Capital's representations regarding sufficient liquid capital were false.

201.    HAS Capital, through its actual and apparent agents Wheeler, Decator, and/or Peterson knew or should have known those statements were false.

202.    HAS Capital's continuing and false representations constituted a material breach of the Agreement between HAS Capital and Plaintiffs.

203.    On August 12, 2015 at 10:41 AM, Mayer demanded payment by HAS Capital of the Costs that were expended in Plaintiffs' performance in contemplation of the Agreement for the Balmoral and Cypress Point transactions.

204.    On or about August 12, 2015, Mayer submitted an invoice to HAS Capital for Plaintiffs' Costs of $96,778.79, exclusive of the Compensation.

205.    HAS Capital has wrongfully refused to pay all $96,778.79 in Costs to Plaintiffs, exclusive of the Compensation.

206.    HAS Capital's wrongful refusal to perform under the Agreement and to pay to Plaintiffs the Costs of $96,778.79 constituted a material breach of the Agreement between HAS Capital and Plaintiffs.

207.    Plaintiffs performed and satisfied all their obligations precedent as required by the Agreement.

208.    As a direct and proximate result of HAS Capital's refusal to pay the $96,778.79 Costs, Plaintiffs are entitled to payment of the Costs they expended in performance of the Agreement for the Balmoral and Cypress Point transactions.

209.    As a direct and proximate result of HAS Capital's breach of contract and failure to consummate the Balmoral and Cypress Point transactions to closing, Plaintiffs lost the benefits of the Agreement, the profits to be made under the Agreement, and their Costs under the Agreement.

**WHEREFORE**, Plaintiffs pray that judgment be entered in their favor and against HAS Capital, and that Plaintiffs be awarded compensatory damages in an amount exceeding $50,000, plus costs of this suit and any other relief this Court deems just and reasonable.

## COUNT XV – QUANTUM MERUIT
### (HAS Capital)

210.    Pleading in the alternative, assuming the absence of  a contract between HAS Capital and Plaintiffs, Plaintiffs incorporate the allegations contained in paragraphs 1–44 and 49–130 as if fully set forth herein.

211.    Between March 5, 2012 and August 2015, Plaintiffs provided services for the benefit of HAS Capital and its affiliates as purchasers of the Balmoral, Cypress Point, and St. Andrews Properties.

212.    The services included, but were not limited to:

a.    Providing substantial expertise, skill, knowledge, effort, labor, time, and other resources to facilitate real estate transactions as HAS Capital's and its affiliates as purchasers' operating partners; and

b.    Using Plaintiffs' brokerage contacts and Plaintiffs' reputation with those contacts to find, underwrite, and otherwise facilitate real estate acquisitions for HAS Capital's and its affiliates as purchasers' benefit.

213.    Plaintiffs' services for the benefit of HAS Capital were not rendered gratuitously.

214.    HAS Capital knew or should have known that such services were not rendered gratuitously.

215.    HAS Capital accepted the services without objection.

216.    If, at the time such services were rendered by Plaintiffs for the benefit of HAS Capital, no enforceable contract or agreement existed that provided for the payment of some or all of such services, then Plaintiffs are entitled to the reasonable value of services rendered.

217.    Because no enforceable contract or agreement existed that provided for the payment of some or all of such services, Plaintiffs are entitled to the reasonable value of services rendered.

218.    On August 12, 2015 at 10:41 AM, Plaintiffs demanded payment by HAS Capital of the costs that Plaintiffs expended for HAS Capital's benefit, including its benefit in the Balmoral and Cypress Point transactions.

219.    HAS Capital refused to pay any sum to Plaintiffs for the services rendered for HAS Capital's benefit.

**WHEREFORE**, Plaintiffs pray that judgment be entered in their favor and against HAS Capital, and that Plaintiffs be awarded compensatory damages in an amount exceeding $50,000, plus costs of this suit and any other relief this Court deems just and reasonable.

Respectfully submitted,

BY:  /s/ Jeanine L. Stevens
         One of Plaintiffs' Attorneys

Atty. No. 6189594
Stevens Law Group, Attorneys for Plaintiffs
432 North Clark Street - Suite 202
Chicago, Illinois  60654
(312) 836-0303
jstevens@stevenslawpc.com
F:\ChrisKen.990\Complaint - 2016.10.31.docx

## REAFFIRMATION OF JURY DEMAND

Plaintiffs hereby reaffirm their demand for trial by jury in the above-captioned matter.

Respectfully submitted,

BY: /s/ Jeanine L. Stevens
One of Plaintiffs' Attorneys

Atty. No. 6189594
Stevens Law Group, Attorneys for Plaintiffs
432 North Clark Street - Suite 202
Chicago, Illinois 60654
(312) 836-0303
jstevens@stevenslawpc.com
F:\ChrisKen.990\Complaint - 2016.10.31.docx

OPERATING PARTNERSHIP

and

MANAGEMENT AGREEMENT

by and between

HAS CAPITAL, LLC
an Illinois limited liability company,
as Owner

and

THE CHRISKEN GROUP and its affiliate
CK PROPERTY MANAGEMENT, LLC,
an Illinois limited liability company,
as Manager

Date: as of April 18, 2015


PLAINTIFF'S EXHIBIT A

OPERATING PARTNERSHIP AND MANAGEMENT AGREEMENT

THIS OPERATING PARTNERSHIP AND MANAGEMENT AGREEMENT (this "Agreement" is made as of April 18, 2015, by and between HAS Capital, LLC, an Illinois limited liability company ("HAS"), and The ChrisKen Group (together with its affiliates, "CKG") for certain services more particularly described below with the objective of acquiring multifamily properties.

## RECITALS

CKG agrees to provide the services further described as an HAS Operating Partner.

FURTHERMORE properties sourced by CKG once acquired will then be managed by CK Property Management, LLC, an affiliate of CKG ("Manager"), per a separate Property Management Agreements for each such property acquired.

## AGREEMENT

NOW, THEREFORE, for and in consideration of the covenants herein contained and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged and confessed, the parties agree as follows:

The ChrisKen Group ("CKG") agrees to provide the following services:

CKG's responsibilities will include identifying, underwriting, negotiating in tandem with HAS, and providing whatever assistance HAS requires, as Buyer. Upon each property closing, Manager will provide property site-management pursuant to a Management Agreement to be negotiated by HAS and Manager.

CKG responsibilities will include:

1. Sourcing multifamily acquisition properties for HAS:
   a. CKG will utilize its broker contacts throughout the US in identifying properties that meet the investment criteria as defined by HAS.
   b. Properties identified will either be available as "off-market", or on an open-bid basis.
2. Underwriting:
   a. CKG will provide an Initial Financial Underwriting ("Initial Underwriting") at the time a property is submitted to HAS.
   b. If the Initial Underwriting is accepted by HAS, CKG will physically inspect the property at the earliest possible date and on a timely basis report the results to HAS.
   c. Based on the inspection, CKG will reconfirm or modify assumptions made in the Initial Underwriting and provide results to HAS.

2

                     i. CKG will modify any underwriting assumptions as requested by HAS

3. Offering Stage:
   a. In advance of a "call for offers" CKG and HAS will agree on price and terms to be included in an initial non-binding LOI, which will be prepared by CKG with review and approval by HAS.
   b. CKG in conjunction with HAS will be responsible for property negotiations:
      i. If a "qualifying" call between the Seller and HAS as Buyer is required, CKG will be responsible for satisfying the underwriting assumptions as may be requested by the Seller. HAS will participate on the call and provide sufficient evidence of capital to close and discretion as required.

4. CKG will provide all HAS requested services necessary to secure mortgage debt for a property acquired and will further provide required lender reports as necessary.

5. Once property is acquired, operational reporting to HAS will be provided by Manager, as further detailed in the Management Agreement.

6. Property Sale.
   a. From time to time, CKG will provide as requested sell/hold recommendations. If HAS elects to sell a property, HAS will provide sufficient advance notice to Manager so proper disposition protocols can be made.

7. Compensation. (See Exhibit A attached)

8. Property Acquisition Expense Recovery:
   a. CKG will be responsible for the cost of vetting property for submission to HAS, to include:
      i. Broker communications, inclusive of face-to-face meetings.
      ii. CKG will be responsible for all its costs associated with site inspections.
   b. In the event reimbursement is due CKG, such reimbursement, as approved by HAS, will come from closing proceeds.

9. Notwithstanding the foregoing, all acquisition or refinancing third-party costs, on an HAS approved property, whether such property closes or not are the sole responsibility of HAS. These include, but are not limited to: legal, accounting, engineering, lender fees, title fees and due diligence expenses. HAS further agrees to pay such costs on a timely basis.

(SIGNATURES ON NEXT PAGE)

3

**IN WITNESS WHEREOF,** the parties have executed the Agreement on the day and year herein first above written.

HAS CAPITAL, LLC

By: _____
    Stephen A. Wheeler as Chairman

THE CHRISKEN GROUP

By: _____

Name: _____

Its: _____

4

## EXHIBIT A
## COMPENSATION

To be determined on a property-by-property basis; provided that, for the purpose of determining the IRR Preference hurdle:

Effective Net Profits. As used herein, the term "Effective Net Profits" means, as to any period, the Gross Receipts from the Project less all operating, maintenance, and leasing expenses (including all management fees and all reimbursable expenses) and all loan payments, if any.

Internal Rate of Return. As used herein, the term "Internal Rate of Return" means, as of any date of calculation, the internal rate of return (expressed as a percentage) on the aggregate equity investment amount of HAS, as determined by HAS in its reasonable discretion. In determining the Internal Rate of Return, the following shall apply:

1. all calculations shall be based upon the actual dates on which HAS has made equity investments into the Project (and the amount thereof) and the actual dates on which distributions to HAS of net profits from the Project are delivered to HAS;

    (a) all distribution amounts to HAS shall be based on the amount of the gross distribution prior to any withholding or deduction for any federal, state or local income tax requirements; and

    (b) all calculations shall employ the "XIRR" function (with quarterly compounding) as calculated in Microsoft Excel using reasonable "guesses" based upon the data in clauses (a) and (b) above or such other calculation methodology commonly used by accounting and financial professionals at such time of calculation.

2. Notwithstanding anything to the contrary, by mutual agreement between the parties to this agreement, the timing and method used in calculating the IRR preference hurdle can be modified.

5

OPERATING PARTNERSHIP HAS CK V3 (1)04



**H A S
CAPITAL**

---

### MEMORANDUM

---

| | |
|---|---|
| **TO:** | **CK PROPERTY MANAGEMENT, LLC** |
| **FROM:** | ADAM D. PETERSON |
| **SUBJECT:** | BASIC ECONOMIC TERMS FOR OPERATING PARTNERSHIP INVESTING IN MULTI-FAMILY APARTMENTS |
| **DATE:** | 4/22/2015 |
| **CC:** | STEPHEN A. WHEELER |

---

As we discussed yesterday, the basic economics of our business relationship as they relate to CK Property Management, LLC are outlined below as HAS Capital, LLC or its affiliates will act as Owner and CK Property Management, LLC will act as Operating Partner and Manager in our selected investments in multi-family apartments.

- Acquisition Fee – 1.0% of the Purchase Price of the underlying asset – 0.75% paid at Closing of the acquisition, 0.25% paid at permanent debt financing of the asset.

- Ongoing Property Management Fee – 4.0% of collected gross revenues, paid monthly

- Construction Management Fee – 5.0% of all renovation/value add construction costs; paid as drawn from a construction reserve. No construction management fee will be paid on normal periodic repairs less than $25,000 in total.

- Disposition Fee – 0.50% of the gross sales price of the underlying asset at its eventual sale

- Profit Participation – 10% of ongoing Net Cash Flow after an Internal Rate of Return on the total investment by HAS Capital reaches 8.0%. Such internal rate of return will be calculated on a "Private Equity Basis" assuming a market sale beginning on the 3rd anniversary of the initial intermediate term financing of the underlying asset; regardless of whether a sale is actually consummated. The Internal Rate of Return will be based upon the equity investment of HAS Capital, LLC remaining immediately following the initial intermediate term financing.

These are the recollections from my notes from the meeting of April 21. Please provide any comments you may have directly to me.

30 North La Salle Street, Suite 1402
Chicago, Illinois 60602
Telephone ( 312) 346-1874 Facsimile (773) 295-0009